UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

GARY GLENN, LEVON YUILLE, RENE
OUELLETTE, JAMES COMBS,

        Plaintiffs,

                                              Case Number 10-10429-BC
v.                                         Hon. Thomas L. Ludington

ERIC H. HOLDER, JR.,

        Defendant.
_____/

## ORDER GRANTING ATTORNEY GENERAL'S MOTION TO DISMISS AND DISMISSING COMPLAINT FOR LACK OF JURISDICTION

On February 2, 2010, Plaintiffs Gary Glenn, Levon Yuille, René Ouellette, and James Combs filed a complaint [Dkt. # 1] against U.S. Attorney General Eric H. Holder, Jr., challenging the constitutionality of the criminal provisions of the Matthew Shepard and James Byrd, Jr., Hate Crimes Prevention Act ("Hate Crimes Act"), 18 U.S.C. § 249(a)(2). The Hate Crimes Act generally provides criminal penalties for intentionally causing bodily injury to another person when the injury was motivated by the actual or perceived religion, race, color, national origin, gender, sexual orientation, gender identity, or disability of the victim.

According to the complaint, Plaintiff Gary Glenn is a resident of the State of Michigan and the President of the American Family Association of Michigan, an organization that promotes the "Judeo-Christian ethic and . . . all things necessary to promote . . . the traditional and natural family in our society." Compl. ¶ 15. Plaintiff Levon Yuille is also a resident of the State of Michigan, a pastor of The Bible Church in Ypsilanti, Michigan, the National Director of the National Black Pro-Life Congress, and the host of a radio talk show known as "Joshua's Trail." *Id.* ¶ 18. Plaintiff René

Ouellette is a resident of Michigan and the pastor of First Baptist Church of Bridgeport, Michigan. *Id.* ¶ 21. Plaintiff James Combs is the "lead" pastor of Faith Church, The Point Church, The Rock Church, and The River Church, all of which are located in Michigan. *Id.* ¶ 23. Each of the Plaintiffs are identified as Christian, though they have furnished little information about their theological beliefs and the extent to which those beliefs are commonly held, with two exceptions. Each of the Plaintiffs believe that violence is not to be condoned. *Id.* ¶ 41. They also strongly believe that homosexuality is biblically prohibited by provisions in both the Old and New Testaments and that the "complementarity of the sexes reiterates a truth that is evident to right reason and recognized as such by all the major cultures and religions of the world." *Id.* ¶ 34; *see also id.* ¶¶ 28-40. Important to their lawsuit, they contend that Christians generally, and that they, as a part of their public ministry specifically, must be "clear and emphatic [in] their opposition to homosexuality, homosexual activism, and the homosexual agenda." *Id.* ¶ 37.

Plaintiffs allege that the Hate Crimes Act violates their First Amendment rights to express their opposition to homosexuals and homosexual behavior in several ways. First, they contend that the Act is vague when it does not explain what it means for an offender to cause bodily injury "because of" the sexual orientation or gender identity of the victim. Second, they believe that the statute is overbroad in that it criminalizes their constitutional right to express their opinion that homosexual orientation is morally wrong. For similar reasons, they also contend that the Act will chill like-minded people from free association, a right also protected by the First Amendment. Plaintiffs also allege that the Act violates their rights under the Free Exercise Clause of the First Amendment because it penalizes their religious beliefs about homosexuals and their behavior.

While conceding that the Act itself might provide them protection, to the extent that it

punishes bodily injury inflicted by individuals based upon an actual or perceived religious belief of the victim, Plaintiffs allege that the Act violates their Equal Protection rights because it creates an irrational distinction between different religious viewpoints on homosexuality. They contend that the Act disfavors individuals with their belief that homosexual behavior is wrong, in order to protect those who believe it should be tolerated. Finally, Plaintiffs allege that the Hate Crimes Act is unconstitutional because it is not justifiable under the Commerce Clause.

Plaintiffs seek a pre-enforcement declaration that § 249(a)(2) of the Hate Crimes Act violates their above-identified constitutional rights and that Congress lacked authority to enact the Act. They also seek an injunction enjoining the enforcement of § 249(a)(2) of the Act, and an award of attorney fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

Now before the Court is the U.S. Attorney General's motion to dismiss [Dkt. # 9], filed on April 15, 2010. Plaintiffs filed a response [Dkt. # 13] on May 5, 2010; the Attorney General filed a reply [Dkt. # 17] on May 20, 2010; and Plaintiffs filed a sur-reply [Dkt. # 21] on June 8, 2010. A hearing was held on July 14, 2010. The Attorney General argues that Plaintiffs do not have standing and that their claims are not ripe for review by a court, and that the Hate Crimes Act does not violate the First Amendment, the Equal Protection Clause, the Tenth Amendment, or the Commerce Clause.

As will be further explained below, the Attorney General's motion to dismiss will be granted because Plaintiffs lack standing and their claims are not ripe when they have not alleged that they intend to "willfully cause[] bodily injury to any person," or even to "attempt[] to cause bodily injury to any person, because of . . . the actual or perceived . . . sexual orientation [or] gender identity . . . of any person," in violation of the Hate Crimes Act. *See* § 249(a)(2). In addition, it is entirely

speculative that Plaintiffs' conduct would be prosecuted under the Act.

I

The Hate Crimes Act was enacted by Congress and signed into law by the President in October 2009.  Pub. L. No. 111-84, Div. E, 123 Stat. 2190 (Oct. 28, 2009).  The Act provides criminal penalties for "[w]hoever . . . willfully causes bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, attempts to cause bodily injury to any person, because of the actual or perceived religion, national origin, gender, sexual orientation, gender identity, or disability of any person," 18 U.S.C. § 249(a)(2)(A), or "because of the actual or perceived race, color, religion, or national origin of any person," *id.* § 249(a)(1).  With respect to offenses involving "religion, national origin, gender, sexual orientation, gender identity, or disability," the Act requires evidence of an injury's connection to interstate commerce as an element of the offense.  *Id.* § 249(a)(2)(B).  For example, the connection could be that the injury "occurs during the course of, or as a result of, the travel of the defendant or the victim across a State line or national border."  *Id.* § 249(a)(2)(B)(i)(I).[1]

_____

[1]  Including this example, the statute also provides for the following connections to interstate commerce:

(i) the conduct . . . occurs during the course of, or as the result of, the travel of the defendant or the victim--

(I) across a State line or national border; or

(II) using a channel, facility, or instrumentality of interstate or foreign commerce;

(ii) the defendant uses a channel, facility, or instrumentality of interstate or foreign commerce in connection with the conduct . . . ;

(iii) in connection with the conduct . . . , the defendant employs a firearm, dangerous weapon, explosive or incendiary device, or other weapon that has traveled in interstate or foreign commerce; or

(iv) the conduct --

(I) interferes with commercial or other economic activity in which the victim is engaged at the

The term "bodily injury" is defined as "a cut, abrasion, bruise, burn, or disfigurement; . . . physical pain; . . . illness; . . . impairment of the function of a bodily member, organ, or mental faculty; or . . . any other injury to the body, no matter how temporary." *Id.* § 249(c)(1) (citing 18 U.S.C § 1365(h)(4)). The Act clarifies that "bodily injury" "does not include solely emotional or psychological harm to the victim." *Id.* § 249(c)(1). Along with, yet separate from the Hate Crimes Act, Congress also enacted "Rules of Construction," one of which provides that the Act "applies to *violent acts* motivated by actual or perceived race, color, religion, national origin, gender, sexual orientation, gender identity or disability of a victim." Pub. L. No. 111-84, Div. E, Sec. 4710 (1)-(6), 123 Stat. 2841 (Oct. 28, 2009) (emphasis added).[2] While Plaintiffs question the materiality of the

---

time of the conduct; or

(II) otherwise affects interstate or foreign commerce.

*Id.* § 249(a)(2)(B).

[2] The Rules of Construction provide in full:

(1) IN GENERAL. — Nothing in this division shall be construed to allow a court, in any criminal trial for an offense described under this division or an amendment made by this division, in the absence of a stipulation by the parties, to admit evidence of speech, beliefs, association, group membership, or expressive conduct unless that evidence is relevant and admissible under the Federal Rules of Evidence.

(2) VIOLENT ACTS. — This division applies to violent acts motivated by actual or perceived race, color, religion, national origin, gender, sexual orientation, gender identity or disability of a victim.

(3) CONSTRUCTION AND APPLICATION. — Nothing in this division, or an amendment made by this division, shall be construed or applied in a manner that infringes any rights under the first amendment of the Constitution of the United States. Nor shall anything in this division, or an amendment made by this division, be construed or applied in a manner that substantially burdens a person's exercise of religion (regardless of whether compelled by, or central to, a system of religious belief), speech, expression, or association, unless the Government demonstrates that application of the burden to the person is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest, if such exercise of religion, speech, expression, or association was not intended to –

(A) plan or prepare for an act of physical violence; or

(B) incite an imminent act of physical violence against another.

Rules of Construction, they also acknowledge that they "were duly enacted by Congress and are as much a part of the statute as any other language in the Act." *See* [Dkt. # 21, p. 5].

Generally, penalties include up to ten years of imprisonment, a fine, or both. *Id.* §§ 249(a)(2)(A)(i), 249(a)(1)(A). Imprisonment may be up to life when "death results from the offense," *id.* §§ 249(a)(2)(A)(ii)(I), 249(a)(1)(B)(i), or if "the offense includes kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill," *id.* §§ 249(a)(2)(A)(ii)(II), 249(a)(1)(B)(ii).

The Act also contains a "certification requirement," which means that, before a prosecution may occur, the U.S. Attorney General, or a designee, must certify in writing one of the following:

(A) the State does not have jurisdiction;

(B) the State has requested that the Federal Government assume jurisdiction;

(C) the verdict or sentence obtained pursuant to State charges left demonstratively unvindicated the Federal interest in eradicating bias-motivated violence; or

(D) a prosecution by the United States is in the public interest and necessary to secure substantial justice.

*Id.* § 249(b)(1).

---

(4) FREE EXPRESSION. — Nothing in this division shall be construed to allow prosecution based solely upon an individual's expression of racial, religious, political, or other beliefs or solely upon an individual's membership in a group advocating or espousing such beliefs.

(5) FIRST AMENDMENT. — Nothing in this division, or an amendment made by this division, shall be construed to diminish any rights under the first amendment to the Constitution of the United States.

(6) CONSTITUTIONAL PROTECTIONS. — Nothing in this division shall be construed to prohibit any constitutionally protected speech, expressive conduct or activities (regardless of whether compelled by, or central to, a system of religious belief), including the exercise of religion protected by the first amendment to the Constitution of the United States and peaceful picketing or demonstration. The Constitution of the United States does not protect speech, conduct or activities consisting of planning for, conspiring to commit, or committing an act of violence.

Pub. L. No. 111-84, Div. E, Sec. 4710 (1)-(6), 123 Stat. 2841 (Oct. 28, 2009).

Congress made several statutory findings when it enacted the Act, including the following:

(1) The incidence of violence motivated by the actual or perceived race, color, religion, national origin, gender, sexual orientation, gender identity, or disability of the victim poses a serious national problem.

(2) Such violence disrupts the tranquility and safety of communities and is deeply divisive.

(3) State and local authorities are now and will continue to be responsible for prosecuting the overwhelming majority of violent crimes in the United States, including violent crimes motivated by bias. These authorities can carry out their responsibilities more effectively with greater Federal assistance.

(4) Existing Federal law is inadequate to address this problem.

(5) A prominent characteristic of a violent crime motivated by bias is that it devastates not just the actual victim and the family and friends of the victim, but frequently savages the community sharing the traits that caused the victim to be selected.

(6) Such violence substantially affects interstate commerce in many ways, including the following:

(A) The movement of members of targeted groups is impeded, and members of such groups are forced to move across State lines to escape the incidence or risk of such violence.

(B) Members of targeted groups are prevented from purchasing goods and services, obtaining or sustaining employment, or participating in other commercial activity.

(C) Perpetrators cross State lines to commit such violence.

(D) Channels, facilities, and instrumentalities of interstate commerce are used to facilitate the commission of such violence.

(E) Such violence is committed using articles that have traveled in interstate commerce.

. . .

(9) Federal jurisdiction over certain violent crimes motivated by bias enables Federal, State, and local authorities to work together as partners in the investigation and prosecution of such crimes.

(10) The problem of crimes motivated by bias is sufficiently serious, widespread, and interstate in nature as to warrant Federal assistance to States, local jurisdictions, and Indian tribes.

Pub. L. No. 111-84, Div. E, Sec. 4702 (1)-(6), (9), (10), 123 Stat. 2835 (Oct. 28, 2009).

Before enacting the statute, Congress heard evidence regarding the prevalence of hate crimes in the United States and the need for federal involvement to more effectively address the problem.

The House Report on the bill notes that such offenses "are disturbingly prevalent and pose a significant threat to the full participation of all Americans in our democratic society." H.R. Rep. No. 86, 111th Cong., 1st Sess. Pt. 1 at 5 (2009). For example, in 2007, the FBI documented more than 7,600 hate crimes, including 1,265 incidents (16.6%) motivated by bias based upon sexual orientation. *Id.* The enactment of the Hate Crimes Act, the House Report explained, would provide assistance to state and local law authorities for the investigation and prosecution of such crimes, and would permit federal prosecutions "where the State does not have an appropriate statute, or otherwise declines to investigate or prosecute; where the State requests that the Federal Government assume jurisdiction; or where actions by State and local law enforcement officials leave demonstratively unvindicated the Federal interest in eradicating bias-motivated violence." *Id.* at 6. The House Report emphasized that the State and local authorities would continue to "investigate and prosecute the overwhelming majority of hate crimes." *Id.*

In Michigan, for example, "ethnic intimidation," based on race, color, religion, gender, or national origin is "a felony punishable by imprisonment for not more than 2 years, or by a fine of not more than $5,000.00, or both." Mich. Comp. Laws § 750.147b; *see also* Mich. Comp. Laws § 28.257a (requiring local law enforcement to report to state authorities information related to "crimes motivated by prejudice or bias based upon race, ethnic origin, religion, gender, or sexual orientation").

## II

The U.S. Attorney General moves to dismiss Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction based on standing and ripeness requirements. When the defendant challenges subject matter jurisdiction through a motion to

dismiss, the plaintiff bears the burden of establishing jurisdiction. *Angel v. Kentucky*, 314 F.3d 262, 264 (6th Cir. 2002). Motions to dismiss for lack of subject matter jurisdiction can fall into two general categories: facial attacks and factual attacks. *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). A facial attack is a challenge to the sufficiency of the pleading itself; in such an attack, the court takes the material allegations of the complaint as true, and construes them in the light most favorable to the nonmoving party. *Id.* (citation omitted.) A factual attack challenges the factual existence of the subject matter jurisdiction. On such a motion, "no presumptive truthfulness applies to the factual allegations, and the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.* (citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir.1990)). In reviewing a factual attack on jurisdiction, the court has "wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts." *Ohio Nat'l Life*, 922 F.2d at 325 (citations omitted).

Plaintiffs allege that they "take a strong public stand against homosexual activism, the homosexual lifestyle, and the homosexual agenda." Compl. ¶¶ 17, 19, 22, 24. They do not identify a particular denomination of Christianity to which they belong, but they all believe that "[c]lear and emphatic opposition to homosexuality, homosexual activism, and the homosexual agenda is a duty of all Christians," and they "publicly denounce homosexuality, homosexual activism, and the homosexual agenda as being contrary to God's law and His divinely inspired Word." *Id.* ¶¶ 37-38. Plaintiffs allege that as "outspoken opponent[s] of homosexual activism and so-called 'gay rights' legislation," Plaintiffs have been "publicly described" and "listed" as " 'enem[ies]' of those who promote 'gay rights' and other aspect of the homosexual agenda." *Id.* ¶¶ 16, 19.

Plaintiffs allege that the criminal provisions of the Hate Crimes Act deter, inhibit, and chill

their speech and activities because they anticipate that they will be subjected to "increased government scrutiny, questioning, investigation, surveillance, and intimidation on account of their strong, public opposition to homosexual activism, the homosexual lifestyle, and the homosexual agenda." *Id.* ¶¶ 4, 52, 68-69.  They allege that "[t]he enforcement history of similar 'hate crimes' legislation, the public statements of homosexual activists, and the influence of homosexual activists within the federal government demonstrate that Plaintiffs' fears of adverse enforcement action under the Act on account of their deeply held religious beliefs are credible." *Id.* ¶¶ 8, 70-72.

For example, it is alleged that Pastor Yuille is "often warned by his Canadian listeners that he will be targeted for adverse law enforcement action under § 249(a)(2) of the Hate Crimes Act for his public ministry similar to how ministers and other religious persons in Canada are being silenced by that country's 'hate crimes' legislation." *Id.* ¶ 14.  In addition, Plaintiffs allege that "the executive director of the National Gay and Lesbian Task Force . . . blamed 'leaders of the so-called Christian right and their political allies who use their vast resources, media networks and affiliated pulpits to blame lesbian, gay, bisexual and transgender people for all the ills of society' for inducing violence against persons who engage in homosexual behavior." *Id.* ¶ 57.  With respect to one particular incident, it is alleged that the executive director stated: "It is appalling hypocrisy for these forces to pretend that their venomous words and organizing have no connection to the plague of hate violence against gay people, including [this] murder." *Id.* ¶ 58; *see also* ¶¶ 62, 66.  Nonetheless, Plaintiffs do not allege that they intend to "willfully cause[] bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, attempt[] to cause bodily injury to any person, because of . . . the actual or perceived . . . sexual orientation [or] gender identity . . . of any person."  *See* § 249(a)(2).

Finally, Plaintiffs allege that the Hate Crimes Act is unnecessary because "all crimes of violence against innocent individuals. . . are being severely punished" under existing state law. Compl. ¶ 41. They allege that the Hate Crimes Act "elevates those engaged in sexual deviance and sinful behavior to a special class of persons worthy of special protections and recognition," and is therefore "an unjust and immoral law." *Id.*

III

Federal court jurisdiction is limited by the Constitution to "cases" and "controversies." U.S. Const. art. III, § 2; *Flast v. Cohen*, 392 U.S. 83, 94-95 (1968); *Associated Gen. Contractors of Am. v. City of Columbus*, 172 F.3d 411, 415 (6th Cir. 1999) (quoting *Flast*, 392 U.S. at 94-95). Standing, "the core component . . . of the case-or-controversy requirement of Article III," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted), is "the threshold question in every federal case," *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The U.S. Supreme Court has "established that the irreducible constitutional minimum of standing contains three elements":

> First, the plaintiff must have suffered an "injury in fact" - an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not "conjectural" or "hypothetical." Second, there must be a causal connection between the injury and the conduct complained of - the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan*, 504 U.S. at 560-61 (citations omitted). "A plaintiff bears the burden of demonstrating standing and must plead its components with specificity." *Coal Operators & Assocs., Inc. v. Babbitt*, 291 F.3d 912, 916 (6th Cir. 2002).

To assert sufficient injury to bring a pre-enforcement challenge to a criminal statute, a plaintiff must allege "an intention to engage in a course of conduct arguably affected with a

constitutional interest, but proscribed by [the] statute, and there exists a credible threat of prosecution thereunder." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (citing *Doe v. Bolton*, 410 U.S. 179, 188 (1973)). In *Virginia v. American Booksellers Ass'n, Inc.*, this requirement was met when the law that the plaintiffs sought to challenge was "aimed directly at plaintiffs, who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution." 484 U.S. 383, 392 (1988). On the other hand, "persons having no fears of . . . prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs." *United Farm Workers*, 442 U.S. at 298 (quoting *Younger v. Harris*, 401 U.S. 37, 42 (1971)). For example, in *Greater Cincinnati Coalition for the Homeless v. City of Cincinnati*, the plaintiff did not have standing to challenge an anti-panhandling ordinance when he had not violated the ordinance in the past and did not allege that he intended to violate its provisions in the future. 56 F.3d 710, 716 (6th Cir. 1995).

In addition to the constitutional requirements, a plaintiff must also satisfy three prudential standing restrictions. *See Coal Operators*, 291 F.3d at 915-16. First, a plaintiff must "assert his own legal rights and interests, and cannot rest his claim for relief on the legal rights or interests of third parties." *Warth*, 422 U.S. at 499 (citations omitted). Second, a plaintiff's claim must be more than a "generalized grievance" that is pervasively shared by a large class of citizens. *Coal Operators*, 291 F.3d at 916 (citing *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474-75 (1982)). Third, in statutory cases, the plaintiff's claim must fall within the "zone of interests" regulated by the statute in question. *Id.* "These additional restrictions enforce the principle that, 'as a prudential matter, the plaintiff must be a proper proponent, and the action a proper vehicle, to vindicate the rights asserted.' " *Coal Operators*, 291 F.3d at 916 (quoting

*Pestrak v. Ohio Elections Comm'n*, 926 F.2d 573, 576 (6th Cir. 1991)).

Prudential standing requirements are relaxed for plaintiffs who allege that a statute is overbroad in violation of the First Amendment. Such plaintiffs "are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Am. Booksellers*, 484 U.S. at 392-393 (quotation and citations omitted). *See also Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights."); *Dombrowski*, 380 U.S. at 486 ("Because of the sensitive nature of constitutionally protected expression, we have not required that all of those subject to overbroad regulations risk prosecution to test their rights."). Nonetheless, even plaintiffs seeking to assert an overbreadth challenge must first allege sufficient facts to establish a claim that they have suffered or are likely to suffer some injury as a result of the challenged statute. *See Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 353-354 (6th Cir. 2007).

The U.S. Attorney General argues that Plaintiffs cannot meet the threshold requirements for standing because they have not alleged that they intend "to engage in a course of conduct . . . proscribed by [the] statute," or that "there exists a credible threat of prosecution thereunder." *United Farm Workers*, 442 U.S. at 298. In particular, the Attorney General argues that the Plaintiffs have not alleged that they intend to "willfully cause[] bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, attempt[] to cause bodily injury to any person, because of the actual or perceived . . . sexual orientation . . . of any person."

-13-

§ 249(a)(2).  In other words, Plaintiffs have not alleged that they will suffer an injury in fact as a result of the Hate Crimes Act.

The Attorney General emphasizes that the Act prohibits only willful, violent conduct – "willfully caus[ing] bodily injury to any person" or attempting to cause such injury "through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device."  § 249(a)(2); *see also* § 4710 ("This division applies to violent acts motivated by actual or perceived race, color, religion, national origin, gender, sexual orientation, gender identity or disability of a victim.").  To establish a "willful" violation of the Act, the prosecution must prove "that the defendant knew both the pertinent fact(s) and understood the illegality of the pertinent charged conduct."  *United States v. Carney*, 387 F.3d 436, 442 (6th Cir. 2004) (citing *United States v. Bryan*, 524 U.S. 184, 192-93 (1998)).  The Attorney General asserts that because Plaintiffs do not allege that they intend to willfully engage in any violent conduct that might subject them to prosecution under the Act, there is no likelihood that they will be subjected to any federal action or otherwise injured by enforcement of the Act.

The Attorney General acknowledges that Plaintiffs allege that the Act authorizes "federal investigative and other federal law enforcement actions against" them because of their opposition to "homosexual activism, the homosexual lifestyle, and the homosexual agenda," Compl. ¶ 48, and that the Act will subject them "to increased government scrutiny, questioning, investigation, [and] surveillance on account of" their opposition, Compl. ¶ 52.  The Attorney General insists, however, that there is no basis for these allegations in the language of the Hate Crimes Act itself.

The Attorney General also contends that Plaintiffs' allegations that the Act will subject them to liability under 18 U.S.C. § 2, *see* Compl. ¶¶ 54-69, are without foundation.  Section 2(a) of Title

18 provides that one who "aids, abets, counsels, commands, induces or procures" an offense "is punishable as a principal."  To establish this offense, the prosecution must prove "that the substantive offense has been committed" and "that the defendant committed overt acts or affirmative conduct to further the offense, and intended to facilitate the commission of the crime." *United States v. Dolt*, 27 F.3d 235, 238 (6th Cir. 1994) (citations omitted).  The Attorney General asserts that mere speech – without the intent to facilitate the commission of a violent act and the act to provide some active assistance or participation in the offense itself – could not be the basis for a prosecution for aiding and abetting a violation of the Hate Crimes Act.

The Attorney General also addresses Plaintiffs' allegations that their exercise of their First Amendment rights is chilled because they fear they may be investigated in connection with a hate crime, *see, e.g.*, Compl. ¶¶ 52, 69.  The Attorney General emphasizes that Plaintiffs "must present more than '[a]llegations of a subjective chill.'  There must be a 'claim of specific present objective harm or a threat of specific future harm.' "  *Bigelow v. Virginia*, 421 U.S. 809, 816-817 (1975) (quoting *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972)); *White v. United States*, 601 F.3d 545, 554 (6th Cir. 2010).

In *Laird*, for example, "most if not all of the [plaintiffs]" established that they had "been the subject of Army surveillance reports."  *Tatum v. Laird*, 444 F.2d 947, 954 n.17 (D.C. Cir. 1971).  They contended that surveillance of their activities had "chilled" their exercise of First Amendment rights.  *Laird*, 408 U.S. at 13.  The U.S. Supreme Court nevertheless found that plaintiffs did not demonstrate "a direct injury as the result of [the government's] action" because their decision to curtail their expressive activity reflected a "subjective 'chill' " that did not qualify as a "specific present objective harm or a threat of specific future harm" caused by the government's surveillance.

*Id.* at 13-14 (citation omitted); *see also A.C.L.U. v. Nat'l Sec. Agency*, 493 F.3d 644, 661 (6th Cir. 2007) ("[T]o allege a sufficient injury under the First Amendment, a plaintiff must establish that he or she is regulated, constrained, or compelled directly by the government's actions, instead of by his or her own subjective chill."), cert. denied, 552 U.S. 1179 (2008).

Similarly, *Wisconsin v. Mitchell*, 508 U.S. 476 (1993), addressed a First Amendment challenge to a state statute that enhanced an offender's sentence if his crime was motivated by bias. The Court rejected the defendant's claim that the statute was "unconstitutionally overbroad because of its 'chilling effect' on free speech," finding the claim too speculative to support an overbreadth challenge:

> The sort of chill envisioned here is far more attenuated and unlikely than that contemplated in traditional "overbreadth" cases. We must conjure up a vision of a Wisconsin citizen suppressing his unpopular bigoted opinions for fear that if he later commits an offense covered by the statute, these opinions will be offered at trial to establish that he selected his victim on account of the victim's protected status, thus qualifying him for penalty enhancement . . . . This is simply too speculative a hypothesis to support Mitchell's overbreadth claim.

*Id.* at 488-90.

The Attorney General acknowledges that under the Hate Crimes Act, evidence of speech, expression, or associations could be relevant and admissible in a prosecution against an individual who engaged in the prohibited violent actions to prove that individual's motive. *See* § 4710(1); Compl. ¶ 51. The Attorney General once again emphasizes, however, that the Act only prohibits violent conduct, not speech, and that Plaintiffs do not allege that they intend to engage in any such violent conduct. Thus, Plaintiffs' belief that they will be subjected to any kind of investigation in the future is simply too " 'conjectural' or 'hypothetical' " to constitute a claim of actual injury necessary to establish standing. *Lujan*, 504 U.S. at 560 (citation omitted).

The Attorney General addresses the fact that Plaintiffs recite alleged statements by third parties, *see* Compl. ¶¶ 57-67, claims about the enforcement of allegedly similar legislation in other jurisdictions, *see* Compl. ¶¶ 70-72, and statements by congressional supporters of the Hate Crimes Act, *see* Compl. ¶¶ 59, 74-75, in support of their contention that they could be investigated or prosecuted for violating the Act based solely on their speech. The Attorney General contends that such allegations are irrelevant because none of the individuals or organizations quoted by Plaintiffs have any responsibility for enforcement of the Act. The Attorney General emphasizes that any allegation that Plaintiffs might be subjected to false prosecution under the Hate Crimes Act solely because of their public views or associations is too speculative to confer standing. *White*, 601 F.3d at 553-54. The Attorney General asserts that such false prosecution could occur only if a hate crime occurred, if Plaintiffs' speech was somehow associated with such an offense, and if the Act was improperly enforced. *Id.*

The Attorney General acknowledges that the prudential standing requirement that a plaintiff pursue his own personal interests, and not those of a third party, is relaxed in the First Amendment context. Nonetheless, the Attorney General insists that Plaintiffs seek to assert a classic "generalized grievance" against a federal statute with which they disagree. Plaintiffs complain that the statute is "inherently divisive" and creates "a special, protected class of persons under federal law." Compl. ¶¶ 1, 3. They allege that the Act "seeks to normalize" behavior that they believe to be "contrary to the moral law and harmful to the common good of society." Compl. ¶ 4. The Attorney General emphasizes that if Plaintiffs were allowed to pursue litigation based on "mere disagreement with a federal policy," then the judicial system would be flooded with such "generalized grievances."

In response, Plaintiffs emphasize five main points. First, Plaintiffs suggest that the term

"bodily injury," as defined by the Hate Crimes Act, can be interpreted to include a simple headache or stomachache. Plaintiffs emphasize that the definition of "bodily injury" includes "physical pain," "illness," and "any other injury to the body, no matter how temporary." *See* § 249(c)(1) (citing § 1365(h)(4)). In addition, Plaintiffs contend that the Act does not require a battery or other physical act of violence, because it only requires conduct to "cause" bodily injury. They contend that the Rules of Construction and the violence "requirement" are ineffective because they are not included within the text of the statute. Thus, Plaintiffs conclude that the government can investigate and prosecute a person under the Act even if the person does not commit, or counsel, command, or induce another to commit, a physical act of violence.

Second, Plaintiffs emphasize that they have been accused by "supporters of the Act" of causing "bodily injury" to persons because of their sexual orientation, and intentionally counseling, commanding, and inducing others to cause such "bodily injury." *See* Compl. ¶¶ 56-67. Plaintiffs allege that such accusations have been made by organizations such as the National Gay and Lesbian Task Force and the Triangle Foundation, which Plaintiffs assert "have influence with this current administration, [and] from powerful and influential government officials." *See* Compl. ¶¶ 57-67.

Third, Plaintiffs emphasize that nothing "limit[s] the authority of Federal officers, or a Federal grand jury, to investigate possible violations," of the Act, quoting § 249(b)(2). Thus, Plaintiffs contend that law enforcement is specifically authorized to conduct investigations of them, irrespective of any authority to actually prosecute them. Indeed, Plaintiffs allege that supporters of the Act rejected efforts to explicitly exclude expressive conduct such as Plaintiffs, and that the legislative history of the Act demonstrates that the Act was at least in part designed "to protect those potential victims who may be the recipients of hateful words." *See* Compl. ¶¶ 70-75.

Plaintiffs explain that in *Presbyterian Church v. United States*, 870 F.2d 518 (9th Cir. 1989), the Ninth Circuit Court of Appeals allowed the plaintiff churches to pursue an action against the federal government and some of its officers for violating their constitutional rights by conducting covert surveillance on members of their congregations. The court reasoned:

> When congregants are chilled from participating in worship activities, when they refuse to attend church services because they fear the government is spying on them and taping their every utterance, all as alleged in the complaint, we think a church suffers organizational injury because its ability to carry out its ministries has been impaired. . . . A judicial determination that the INS surveillance of the churches' religious services violated the First Amendment would reassure members that they could freely participate in the services without having their religious expression being recorded by the government and becoming part of official records.

870 F.2d at 522-23. Like the plaintiff churches in *Presbyterian Church*, Plaintiffs here assert they have standing to challenge the Hate Crimes Act because they are targets for government scrutiny, questioning, investigation, surveillance, and other adverse law enforcement actions. Moreover, they are seeking judicial reassurance that they can freely participate in their speech and related religious activities without being investigated or prosecuted by the government or becoming part of official records because of their specific beliefs. *See* Compl. ¶ 53.

Plaintiffs also emphasize that in *Epperson v. Arkansas*, 393 U.S. 97, 101-02 (1968), the plaintiff had not been charged under the challenged statute, "no record of any prosecutions in Arkansas" under the challenged statute existed, and the statute was no more than a "curiosity." Yet, the Supreme Court held that the plaintiff had standing to bring the First Amendment challenge. *Id.* In addition, in *Bolton*, the Supreme Court found that abortionists had standing to challenge a state's abortion statute even though "the record [did] not disclose that any one of them [had] been prosecuted, or threatened with prosecution." 410 U.S. 179, 188 (1973). Finally, the Sixth Circuit has held that where a plaintiff "would be subject to application of the [challenged] statute," that

alone is sufficient to provide the "fear of prosecution . . . reasonably founded in fact" to confer standing. *Planned Parenthood Ass'n v. City of Cincinnati*, 822 F.2d 1390, 1395 (6th Cir. 1987).

Fourth, Plaintiffs insist that "speech, beliefs, and expressive conduct are *necessarily* targeted by the Act." Plaintiffs assert that the plain language of § 249(a)(2) "forces" law enforcement officials to treat identical crimes differently depending upon the government official's determination and proof of the political, philosophical, or religious beliefs of the accused offender.

Fifth, Plaintiffs emphasize the severity of the criminal sanctions permitted under the statute. *See Reno v. A.C.L.U.*, 521 U.S. 844, 872 (1997) ("The severity of criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words [or] ideas."); *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002) (noting that "even minor punishments can chill protected speech"). Plaintiffs contend that this case is distinguishable from *Laird*, 408 U.S. 1, because while *Laird* involved government surveillance, it did not involve the potential for criminal sanctions.

In reply, the Attorney General distinguishes *Presbyterian*, *Epperson*, and *Bolton*. The Attorney General highlights that in *Presbyterian*, surveillance of church religious services had actually occurred, thereby justifying the conclusion that the plaintiff churches had standing to bring an action to vindicate their First Amendment rights. However, to the extent that the churches sought prospective relief, the court remanded the case to the district court to determine whether the churches had standing because it was unclear whether the churches would be subject to such surveillance in the future. Here, the Attorney General emphasizes that Plaintiffs seek to premise standing solely on speculation that they might involve themselves in conduct subject to the Hate Crimes Act in the future, and be investigated by law enforcement officers for an offense that they

do not plan to commit.

As to *Epperson*, the Attorney General highlights that counsel for the state acknowledged at oral argument that the plaintiff teacher would be at risk for prosecution if she presented the theory of evolution in class as she said she intended to do.  Here, the Attorney General denies that Plaintiffs could be prosecuted under the Hate Crimes Act for simply expressing their views against homosexuals and homosexual behavior.  With respect to *Bolton*, the Attorney General emphasizes that while the abortion statute at issue had not yet been enforced, the predecessor statute had been enforced.

The Attorney General's arguments are persuasive.  Plaintiffs do not have standing to pursue their claims when they do not allege an"injury in fact," that is both "concrete and particularized," and "actual or imminent."  *Lujan*, 504 U.S. at 560.  In other words, they have not demonstrated that there is an existing "case or controversy" within the meaning of Article III of the U.S. Constitution. Most importantly, Plaintiffs do not allege that they intend to "willfully cause" any "bodily injury." This is true even if one accepts Plaintiffs' proposed definition of "bodily injury," to include simple headaches and stomachaches, because Plaintiffs do not allege that they intend to "willfully cause" headaches and stomachaches.

Moreover, that fact, in combination with the Attorney General's denial that the Hate Crimes Act applies to Plaintiffs' conduct (a conclusion that is supported by the text of the statute, the Rules of Construction, and the legislative history), supports the conclusion that Plaintiffs have not demonstrated that "there exists a credible threat of prosecution" under the Act.  *Babbitt*, 442 U.S. at 298.  Plaintiffs' fear of prosecution is speculative; they do not allege that they have violated the Hate Crimes Act in the past, nor that they intend to violate it in the future.  *See United Farm*

*Workers*, 442 U.S. at 298; *Greater Cincinnati Coal. for the Homeless*, 56 F.3d at 716. Even though Plaintiffs allege that their exercise of their First Amendment rights is chilled, particularly because of the potential for criminal penalties, Plaintiffs have not alleged sufficient facts to demonstrate that they are likely to suffer an injury as a result of the Hate Crimes Act. *See Laird*, 408 U.S. at 13-14; *Mitchell*, 508 U.S. at 488-90; *Prime Media*, 485 F.3d at 353-54.

IV

Whether a plaintiff's claims are ripe also affects a federal court's subject matter jurisdiction. "Ripeness is a mixture of Article III concerns about actual cases or controversies and prudential concerns about the appropriate time for a court to make a decision." *Seiler v. Charter Twp. of Northville*, 53 F. Supp. 2d 957, 961 (E.D. Mich. 1999) (quoting *Cmty. Treatment Ctrs., Inc. v. City of Westland*, 970 F.Supp. 1197, 1209 (E.D. Mich. 1997)). "Ripeness is more than a mere procedural question; it is determinative of jurisdiction. If a claim is unripe, federal courts lack subject matter jurisdiction and the complaint must be dismissed." *Id.* (quoting *Bigelow v. Mich. Dep't of Natural Res.*, 970 F.2d 154, 157 (6th Cir. 1992)).

In *Norton v. Ashcroft*, the court explained, the "[r]ipeness doctrine exists 'to ensure that courts decide only existing, substantial controversies, not hypothetical questions or possibilities.' " 298 F.3d 547, 554 (6th Cir. 2002) (citation omitted), cert. denied, 537 U.S. 1172 (2003). To determine ripeness, a court "examines (1) the likelihood that the harm alleged will ever come to pass; (2) whether the factual record is sufficiently developed to allow for adjudication; and, (3) hardship to the parties if judicial review is denied." *Id.* (citing *Adult Video Ass'n v. United States*, 71 F.3d 563, 568 (6th Cir. 1995)). Since this case presents a pre-enforcement challenge, the Attorney General asserts that it is "ripe for review only if the probability of the future event

occurring is substantial and of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* (citation and quotation omitted).

The Attorney General argues that Plaintiffs' claims are not ripe for review because there is no "likelihood that the harm alleged will ever come to pass," *Norton*, 298 F.3d at 554, when Plaintiffs have not alleged that they intend to engage in any conduct that might violate the Hate Crimes Act. The Attorney General particularly distinguishes the Hate Crimes Act from the Freedom of Access to Clinic Entrances Act ("FACE"), 18 U.S.C. § 248, because FACE prohibits not only violent conduct but also "threat[s] of force" and "physical obstruction."[3] The plaintiffs challenging FACE in *Norton*, for example, alleged that they had engaged in "protesting, praying and counseling on the sidewalks around" a Planned Parenthood clinic; that federal law enforcement officials had told the plaintiffs they might be arrested if they did not move their protests across the street from the clinic; and that they had limited their protest activities at the clinic because of these threats. *Norton v. Reno*, No. 4:00-CV-141, 2000 WL 1769580, at *1-2 (W.D. Mich. Nov. 24, 2000); *see also Am. Life League, Inc. v. Reno*, 855 F.Supp. 137, 139 (E.D. Va. 1994) (finding plaintiffs' claims ripe only after they amended their complaint to allege that "their action at times has constituted, and in the future will constitute . . . 'a physical obstruction' . . . and that by so doing, they interfere with, and/or intimidate and/or injure abortion seekers and providers"), aff'd, 47 F.3d 642 (4th Cir.), cert. denied, 516 U.S. 809 (1995).

The Attorney General also emphasizes that in this case, no offense has occurred, no offenders have been charged, and thus, there is no factual predicate to determine whether any

---

[3] FACE provides criminal penalties for anyone, who "by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services." 18 U.S.C. § 248(a)(1).

particular application of the Hate Crimes Act is unconstitutional. The Attorney General highlights that "[r]ipeness separates those matters that are premature because the injury is speculative and may never occur from those that are appropriate for the court's review." *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 280 (6th Cir. 1997). "Ripeness becomes an issue when a case is anchored in future events that may not occur as anticipated, or at all." *Id.* at 284. Relatedly, the Attorney General asserts that because Plaintiffs have not established any likelihood of harm resulting from enforcement of the Act, they will suffer no hardship if their claims are not reviewed.

In response, Plaintiffs emphasize that there is nothing "hypothetical or speculative" about Plaintiffs' conduct or the manner in which the Act will be enforced. They assert that they have a "well-founded belief that the statute will be enforced (or threatened to be enforced) in ways that deter and inhibit their activities," and that they have a "credible fear of enforcement." Plaintiffs again emphasize that "at every turn during the legislative process, supporters of the Act defeated efforts designed to ensure that it would not – and could not – be enforced as alleged in Plaintiffs' complaint.

Although Plaintiffs do not contend that anyone has threatened them with prosecution, in their sur-reply brief they highlight recent statements by U.S. Attorney Barbara McQuade and Assistant United States Attorneys for the Eastern District of Michigan, to the effect of being "eager" and "excited about" the Hate Crimes Act and generally pursuing enforcement opportunities. Plaintiffs also contend that the Act chills the exercise of their constitutionally protected rights, thereby resulting in irreparable injury, because even a momentary loss of First Amendment rights constitutes irreparable harm, citing *Elrod*, 427 U.S. at 373. Plaintiffs assert that the case is fit for judicial resolution because no further factual development is required.

Plaintiffs' claims are not ripe for review.  Just as Plaintiffs' risk of harm or injury was speculative under the standing analysis, Plaintiffs have not demonstrated a sufficient "likelihood that the harm alleged will ever come to pass" with respect to ripeness.  *Norton*, 298 F.3d at 554.  Plaintiffs present hypothetical situations in which they believe that they will be prosecuted or subject to investigation under the Hate Crimes Act.  They have not demonstrated that such situations are of "substantial and of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *Id.*  Plaintiffs allege their own personal beliefs and assertions of third party members of the general public to suggest that they would be subject to prosecution and investigation under the Act, rather than any concrete, "reasonably founded in fact," threat of prosecution or investigation.  *Cf. Planned Parenthood*, 822 F.2d at 1395.  Finally, the fact that the United States Attorney for this District expressed her administration's intent to vigorously enforce the Hate Crimes Act does not amount to a credible threat of prosecution of the Plaintiffs for their opinions under the factual circumstances alleged.

## V

In addition to arguing that Plaintiffs lack standing and that their claims are not ripe for review, the Attorney General argues that it is entitled to dismissal of Plaintiffs' claims because Plaintiffs have failed to state a claim upon which relief can be granted when the Hate Crimes Act does not violate the First Amendment, the Equal Protection Clause, the Tenth Amendment, or the Commerce Clause.  Plaintiffs do not have standing and their claims are not ripe, therefore, the Attorney General's "failure to state a claim" arguments will not be reached.

Accordingly, it is **ORDERED** that the Attorney General's motion to dismiss [Dkt. # 9] is

**GRANTED**, and Plaintiffs' complaint [Dkt. # 1] is **DISMISSED** for lack of jurisdiction.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: September 7, 2010

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 7, 2010.

s/Tracy A. Jacobs
TRACY A. JACOBS